Stuart W. Thomas, Karen Nelson, and H. Ford Thomas ("Thomas") appeal from a judgment of the Greene County Court of Common Pleas, entered after a jury trial, which ordered them, jointly and severally, to pay $40,200 plus 10% annual pre-judgment interest to Irongate Realty, Inc.
On December 12, 1995, Irongate filed a complaint against Stuart Thomas, Karen Nelson, and their father, Ford Thomas, (collectively referenced as "the Thomas family"), to recover a six-percent real estate commission for procuring a lease of a restaurant building located at 4141 Colonel Glenn Highway, Beavercreek, Ohio ("the restaurant building"). On December 22, 1995, the Thomas family filed an answer denying the existence of a contract to pay Irongate a commission and asserting that Irongate, through its broker Donald Walters, had breached fiduciary duties and was therefore precluded from recovering a commission. On June 2, 1996, the Thomas family filed a motion for summary judgment, and the trial court denied summary judgment on August 28, 1996.
The evidence produced at trial, which occurred on February 12, 13, and 14, 1997, established the following:
 In 1993 and 1994, Stuart Thomas and Nelson pursued plans to sell or lease the restaurant building, which had been operating as the Sunset Grill. They authorized their father to search for potential buyers or tenants. On June 8, 1993, October 24, 1993, and April 26, 1994, Thomas signed exclusive listing contracts with West Shell Realtors authorizing them to procure a buyer or lessee of the restaurant building. When Walters learned from his wife that the restaurant building may have been placed on the market, Walters telephoned Thomas, and they met for lunch at the restaurant building on August 22, 1994. Although Walters and Thomas' trial testimony conflicted as to whether Thomas had expressed an interest in leasing the restaurant building, both agreed that they had discussed Walters' interest in locating a purchaser for the restaurant building. Thomas asked Walters what he would charge for a commission, and Walters told him six percent. Walters did not ask and Thomas did not volunteer whether Thomas was under an exclusive listing contract with another realtor.
Following the meeting, Walters prepared, signed, and forwarded to Thomas an exclusive listing contract, which stated the following handwritten terms: sale price of $1,000,000 or monthly lease rate of $7,000, and a brokerage fee of six percent. This proposed contract utilized a fill-in-the-blanks Dayton Area Board of Realtors "Exclusive Right To Sell Contract" form. In the document, the six-percent brokerage fee was thus mentioned in the context of sale, and not mentioned in the context of lease. On August 25, 1994, without having signed the contract, Thomas returned it along with a note stating, "I am soliciting offers from a number of sources and am willing only to sign a non-exclusive listing. No one else, however, has brought an offer and an offer from a client of yours would unlikely have one ahead of it." Walters interpreted this note as creating a verbal, non-exclusive listing contract that would entitle him to a commission if he brought Thomas a buyer or lessee. Walters contacted Karen Williams, the manager of Sunset Grill, for permission to show the building to interested parties and to obtain an income and expense statement. He requested and received information on the property from a title insurance company. Walters also contacted Robert Blank, a realtor with Duberstein Investments, for assistance in finding interested parties. Blank contacted Michael T. Brandy, the real estate site developer for Burbank's Restaurant, regarding the potential purchase or lease of the restaurant building. Blank called Walters to inform him of Burbank's interest in the building, and Walters telephoned Doug Schlerbaugh, the new manager of the Sunset Grill, to schedule a time for a showing. On November 11, 1994, Brandy and Ted Redden, the president of Burbank's Restaurant, met with Blank and viewed the property.
On November 14, 1994, Brandy sent a letter to Blank offering to lease the building for $50,000 gross annual rent plus three percent overage on restaurant sales. Blank forwarded the letter to Walters, and on November 18, 1994, Walters faxed it to Thomas. Walters and Thomas discussed the offer and decided to make a counteroffer. On December 14, 1994, Thomas faxed Walters a counteroffer, which stated the following terms:
10 Year lease with two 5-year consecutive options
 Rent: Year 1 — $60,000; Year 2 — $65,000; Years 3 thru 10 — $70,000 (A 4% gross sales overage applies to each year of the lease)
 Tenant pays for all permits, maintenance, utilities, insurance, broker fees, taxes and assessments. Note: Current real estate taxes are approximately $12,000 per year.
According to Walters, December 14, 1994, the date of this fax, was the first time that Thomas expressed his unwillingness to pay a commission in the event of a lease. On that same day, Walters faxed the counteroffer to Blank and telephoned him to discuss the terms. Walters and Blank talked about possible changes that could make a deal work. In a format similar to Thomas' counteroffer, Walters altered the counteroffer and faxed it to Blank. Walters' altered proposal stated:
 10 Year lease with two 5-year consecutive options Rent: Year 1 — $64,000, Year 2 — $69,000, Years 3 thru 10 — $74,500 (A 4% gross sales average applies to each year of the lease)
 Tenant pays for all permits, maintenance, utilities, insurance, taxes and assessments. Note: Current real estate taxes are approximately $12,000 per year.
Walters then informed Thomas, via a fax message, that he had forwarded the counteroffer to Burbank's and had adjusted the lease amounts to include a six-percent commission. He further stated that a "commission of 6% is expected on total lease payment excluding taxes and assessments." According to Walters' testimony, although he mistakenly wrote that the altered proposal had been forwarded to Burbank's, he had actually forwarded the altered proposal only to Blank.
On December 16, 1994, Thomas requested a copy of the altered proposal, and Walters sent Thomas a fax stating:
 Decided not to change your fax. Burbanks is not interested. They felt your offer was actually higher than the original $84,000 year gross lease. No interest.
On that same day, Kelly Cooney, an agent of Thomas, faxed a message to Brandy indicating that he and Thomas would like to meet with Brandy. Brandy, Thomas, and Cooney met on December 27, 1994 and negotiated most of the terms for a lease of the restaurant building. On March 16, 1995, Redden signed the lease agreement on behalf of Burbank's Beavercreek, Inc. Stuart Thomas and Nelson signed it on March 23, 1995. In August 1995, Blank learned about the lease agreement and telephoned Walters asking him to request a commission from Thomas. Walters then called Thomas, who "kind of laughed and made some reference to he couldn't hear very well." On August 29, 1995, brokers at Irongate and Duberstein sent a letter to Thomas requesting that they get together to discuss their commissions. Following Thomas' persistent refusal to pay a commission, Irongate filed a complaint on December 12, 1995.
On February 14, 1997, the jury answered two interrogatories, finding that Thomas "did enter into a contract for Plaintiff to procure a lessee and payment of commission" and that Irongate "was the procuring cause resulting in the lease entered into between Burbank's and the Defendants." The jury awarded $40,200 to Irongate, and on June 5, 1997, the trial court ordered the Thomas family to pay this amount plus ten percent pre-judgment interest from March 16, 1995 to June 5, 1997.
The Thomas family asserts four assignments of error on appeal. Because the parties' briefs addressed the first three assignments in a single discussion, we will do the same.
 I. THE VERDICT AND JUDGMENT OF THE TRIAL COURT IS WHOLLY UNSUPPORTED BY THE EVIDENCE.
 II. THE VERDICT AND JUDGMENT OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. THE TRIAL COURT ERRED REFUSING TO DIRECT A VERDICT AT THE CLOSE OF PLAINTIFF'S EVIDENCE.
The Thomas family contends that there was insufficient evidence to permit the case to go to the jury and to sustain the verdict.
A trial court must enter a directed verdict if the evidence, construed in the non-moving party's favor, establishes that reasonable minds could only reach a conclusion against that party on any determinative issue. Civ.R. 50(A)(4); O'Day v. Webb
(1972), 29 Ohio St.2d 215, 220. Upon a motion for directed verdict, the trial court must determine whether the evidence is legally sufficient to send the case to the jury. Ruta v.Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 68. If the plaintiff does not present evidence on an essential element of the cause of action, the trial court should remove the issue from the jury's consideration by directing a verdict in the defendant's favor. Rayburn v. J.C. Penney Outlet Store (1982), 3 Ohio App.3d 463,464. In reviewing the trial court's decision whether to direct a verdict, we employ this same standard. Donaldson v.Northern Trading Co. (1992), 82 Ohio App.3d 476, 480. Furthermore, to determine whether the verdict was against the manifest weight of the evidence, we are guided by the supreme court's discussion in State v. Thompkins (1997), 78 Ohio St.3d 380,387:
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * *" Blacks [Law Dictionary (6 Ed. 1990)] 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. (Citations omitted.)
We are mindful that the trial court is in the best position to determine credibility of witnesses. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported.
 A. THE PLAINTIFF FAILED TO PRODUCE ANY EVIDENCE THAT THERE WAS A CONTRACT FOR THE PAYMENT OF A COMMISSION UPON THE EVENT OF LEASING OF DEFENDANT'S COMMERCIAL BUILDING.
A real estate broker is entitled to a commission if he satisfies the burden of proving the existence of an express or an implied contract for the performance of his services. Suter v.Farmers' Fertilizer Co. (1919), 100 Ohio St. 403, 408. An implied contract exists when "a seller authorizes the broker to produce a buyer under circumstances which should reasonably cause the owner to believe he will be expected to compensate the broker for those services." Ostendorf-Morris Co. v. Slyman (1982), 6 Ohio App.3d 46,47. An implied contract is not established simply because the broker introduced the buyer to the seller or because the broker showed the property to the buyer. Id. at 47. Furthermore, when the broker solicited the property listing, the mere facts that the broker inquired into and learned the price of the property and discussed his commission with the seller do not establish an implied contract for a commission. Tenbusch v. L. K. N. Realty Co.
(1958), 107 Ohio App. 133, 140.
The jury specifically concluded that Walters and Thomas had entered a contract for the payment of a real estate commission. Thomas admitted that he and Walters had discussed Walters' rate of commission. Although Thomas testified that he had not been interested in leasing the building at the time of their lunch meeting, the jury could have found his testimony not credible given that he had previously signed three exclusive listing contracts for the sale or lease of the building. Even though Thomas had refused to sign the exclusive listing contract prepared by Walters, his note dated August 25, 1994 invited Walters to bring him offers and did not express a refusal to pay the six-percent commission in the event of a lease, despite the express mention in the exclusive listing contract of a lease rate of $7,000 per month. Walters testified that Thomas had not mentioned, during their many telephone and facsimile communications, that Walters would not be entitled to a commission upon procuring a lessee. Even after Thomas knew that Burbank's had made an offer for a lease, he did not discuss the commission issue with Walters. Walters and Brandy testified that, in the normal course of business, a lessee would not pay the brokers' commission. According to Brandy and Redden, Burbank's never before paid the commission when entering a lease as the tenant. A factfinder thus could have reasonably found that, as a licensed real estate broker, Thomas knew or should have known that, in the normal course of business, lessors pay the commission. A jury could have reasonably found from the evidence recounted above, including the many verbal and written communications between Walters and Thomas, that an implied contract existed between them that Thomas would pay a commission in the event of a lease as well as a sale, and that this implied contract was created months before Thomas first expressed a contrary intention on December 14, 1994. We agree with the trial court's denial of the Thomas family's motion for a directed verdict because, at the conclusion of Irongate's prima facie case, reasonable minds could have concluded that a contract existed. Civ.R. 50(A)(4). Furthermore, the verdict was not against the manifest weight of the evidence because it was reasonable for the jury to conclude that the totality of the circumstances indicated a manifestation of intent to contract for a real estate commission in the event of a sale or a lease.
 B. THE PLAINTIFF FAILED TO ESTABLISH THAT IT WAS THE PROCURING CAUSE OF THE BURBANKS LEASE AGREEMENT.
The Thomas family contends that Irongate was not the procuring cause of the lease because Walters' involvement in the lease negotiations terminated when he faxed the December 16, 1994 note indicating that Burbank's had no interest in Thomas' counteroffer.
A broker is not entitled to recover a commission unless he establishes that he was the "procuring cause" of the sale or lease. Bauman v. Worley (1957), 166 Ohio St. 471, 473. The question of whether a broker was the procuring cause of the sale or lease is a question of fact that depends on the particular facts and circumstances of each case. Id. at 473. The Bauman
court stated:
 "The term `procuring cause' as used in describing a broker's activity, refers to a cause originating a series of events which, without break in their continuity, result in accomplishment of the prime objective of employment of the broker — producing a purchaser ready, willing and able to buy real estate on the owner's terms." (Citations omitted.)
Id. at 473. The broker must "find a purchaser and bring the purchaser and owner together so that they may enter into a binding contract of sale and purchase of the subject property."Dehlendorf v. Marcborough Properties Ltd. (Jan. 5, 1989), Franklin App. No. 88AP-767, unreported. In Schaefer v. Winkler
(1948), 82 Ohio App. 435, 437-438, the court explained that even though the broker and seller had not signed an exclusive listing contract and the seller was therefore free to sell the property himself or through another broker, he nonetheless "should not take advantage of the [broker's] services by knowingly selling, either directly or indirectly, to a purchaser found by him."
In response to the second interrogatory, the jury expressly found that Irongate was the procuring cause of the lease. Walters testified that he had contacted Blank, who then made Burbank's aware of the restaurant property. Walters continued to be involved in the negotiations by providing Blank with financial data on the restaurant and demographic information on the area near the restaurant building. Walters also contacted the manager of the Sunset Grill to set up a time for Blank to show the property to Burbank's. Brandy testified that he had first learned about the restaurant building from Blank's "cold call" in the fall of 1994, that Blank had shown him and Redden the property, and that he had not met face-to-face with Thomas until December 27, 1994. Brandy testified that the property showing had been a significant event in their negotiations. Redden testified that, although he and Brandy had not been interested in the terms of Thomas' counteroffer, they had remained interested in the restaurant building and that Brandy had "thought we had room to move on this deal." From this testimony, the trial court correctly refused to direct the verdict in the Thomas family's favor and the jury reasonably determined that Irongate had been the procuring cause of the lease. The Thomas family cannot deprive Irongate of a commission after having taken advantage of its services by knowingly leasing to Burbank's, a lessee whom Irongate had located. Schaefer, 82 Ohio App. at 438.
 C. PLAINTIFF IRONGATE (WALTERS) VIOLATED ITS FIDUCIARY DUTY TO DEFENDANTS AND IS THEREFORE PRECLUDED FROM RECOVERY.
The Thomas family contends that Walters violated his fiduciary duties by offering the property for sale at terms unauthorized by Thomas, by misrepresenting to Thomas that he had not actually changed the counteroffer, by creating a forged counteroffer, and by failing to disclose to Thomas the true status of his negotiations with Burbank's.
A real estate broker, acting within the scope of his agency, owes the fiduciary duties of disclosure, good faith, and loyalty to the seller. Case v. Business Centers, Inc. (1976), 48 Ohio App.2d 267,270. When the broker breaches his fiduciary duties, commits fraud, acts in bad faith, or otherwise breaches the seller's trust, he is precluded from recovering a commission. Id.
at 270; Greenberg v. Meyer (1977), 50 Ohio App.2d 381, 383.
Walters denied having made an offer to Burbank's at terms unauthorized by Thomas. He testified that, upon receiving Thomas' counteroffer, he had become angry at the commission term, but had faxed the proposal to Blank and had telephoned him to discuss it. Walters explained that he and Blank had discussed "some possible changes, how could we put this deal together, how could we make it work" and that one such change was "putting the commission back in the price and netting Thomas the same amount of money, but with the commission being paid by the seller or leaser." Blank testified that when two brokers know that both the seller and buyer are interested in a deal, it is common to discuss potential terms that might help consummate the deal. Walters stated that he had informed Blank that he would fax him the changes and that Walters had known that he did not have the authority to alter Thomas' proposal but that "this was just correspondence between 2 brokers about how can we put the deal together." He denied having instructed Blank to forward the altered proposal to Burbank's. Blank testified that he had faxed the original counteroffer, but not the altered proposal, to Brandy, who remembered discussing the terms of the original counteroffer with Blank on the telephone. Furthermore, Redden stated that he and Brandy had discussed the terms of the original counteroffer. From the testimony of these witnesses, it was reasonable for the jury to believe Walters' version of the story rather than Thomas' version.
Walters also denied that he had lied to Thomas when stating that he had decided not to change the original counteroffer. It was reasonable for the jury to believe that Walters had not lied in light of the testimony that Walters and Blank had not forwarded the altered proposal to Burbank's. Additionally, Walters' conduct in transmitting the altered proposal to Blank was not necessarily an attempt to commit a forgery. Although Walters designed the altered proposal to look like Thomas' original counteroffer, Walters testified that he had informed Blank of the changes and that he had not attempted to convince Blank that the altered terms were proposed by Thomas. Furthermore, the evidence suggested that the altered proposal had not been forwarded to Burbank's. Finally, the jury could have reasonably found that Walters did not fail to disclose to Thomas the status of negotiations with Burbank's because Walters testified that his discussions with Blank about changes to the counteroffer were not intended as negotiations with Burbank's. In our opinion, the trial court acted appropriately in refusing to direct the verdict, and it was reasonable for the jury to conclude that Irongate had not breached its fiduciary duties.
The first three assignments of error are overruled.
 IV. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE ISSUE OF AGENCY.
The Thomas family contends that the trial court should have granted the request for the following jury instruction:
 The evidence in this case has established that Robert Blank was acting as the agent for Burbank's for the purpose of receiving offers from prospective lessors of restaurant facilities and that he received, in that capacity, certain proposals communicated by Don Walters who was acting as agent for the sellers/lessors. The jury is instructed that Burbank's is chargeable with, and bound by, knowledge or notice of such offers received by its agent in the course of such agency, even though such knowledge or notice may not have actually been communicated to Burbank's.
Irongate objected to the Thomas family's request for this instruction on the ground that it would have confused and misled the jury, and the trial court refused to give it. In our opinion, this instruction would have taken from the jury an issue that the jury should have decided and was thus improper. It was for the jury to decide whether Walters' altered proposal, which Walters sent to Blank, was intended as an offer, which would have been deemed to have been also communicated to Burbank's, or merely a basis for discussion between two brokers attempting to consummate a deal. The Thomas family's proposed instruction, however, removed this factual determination from the jury and presumed that the altered proposal was indeed an offer. A proper instruction would have left it open for the jury to decide whether the altered proposal was an offer. Because the proposed instruction removed from the jury an essential factual inquiry, the trial court acted appropriately in refusing to give the proposed instruction to the jury.
The fourth assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Dianne F. Marx
John E. Fulker
Hon. Thomas M. Rose